# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.

JOHN DOE, a minor, by and through his next friend, JANE DOE,

Plaintiff(s),

v.

ADAMS 12 FIVE STAR SCHOOLS

Defendant.

## COMPLAINT WITH JURY DEMAND

Plaintiff, John Doe, by and through his next friend and mother Jane Doe ("Ms. Doe") hereby files this action, through the undersigned counsel of record Kishinevsky & Raykin, Attorneys at Law, and states as follows. This action seeks injunctive relief, declaratory relief, and appropriate damages and costs.

### I. JURISDICTION AND VENUE

1. The court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367. Federal question jurisdiction arises under the Constitution and laws of the United States of America,

2. Plaintiff is a resident of Adams County, Colorado.

3. Defendant Adams 12 Five Star Schools has its principal place of business in Adams County, Colorado.

4. Venue is proper pursuant to 28 U.S.C. § 1391(b) as the wrongful acts alleged by the plaintiff occurred in whole or in part in Colorado.

### II. PARTIES

5. Plaintiff is a minor student currently enrolled in the Defendant's school district.

6. Plaintiff is a disabled individual within the meaning of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*; Section 504 of the United States Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; and the Colorado Anti-Discrimination Act ("CADA"), C.R.S. § 24-<u>234</u>-801 *et seq.* The Plaintiff's disabilities impair major life activities such as working, communicating, and thinking.

7. Defendant Adams 12 is a recipient of federal financial assistance subject to the requirements of Section 504, 34 C.F.R. § 104.11, and a public governmental entity subject to the provisions of the ADA, 42 U.S.C. §§ 12132, 12131, (1)(A), (B).

8. Defendant Adams 12 is subject to the provisions of the CADA. C.R.S. § 24-34-802.

### III.   FACTUAL ALLEGATIONS

*Introduction and Background*

9. The Plaintiff, John Doe, ("J.D.") is a minor student with multiple severe emotional, social, and behavioral disabilities. J.D. suffers from post-traumatic stress disorder ("PTSD"), reactive attachment disorder ("RAD"), Oppositional Defiant Disorder ("ODD"), Trauma Disorder, Paraphilic Disorder, and Pedophilic Disorder.

10. J.D.'s disabilities impair major life activities such as communicating, working, and thinking.

11. J.D.'s parents, Jane and Janet Doe (the "Does" or "Parents"), adopted him at the age of 4. Prior to his adoption, J.D. was removed from his biological home and placed in two foster homes.

12. J.D. experienced significant neglect and abuse before his adoption.

13. In September 2022, J.D. was removed from his home due to concerns regarding sexual misconduct.

14. J.D. was detained as a juvenile, then placed in a foster home in the winter of 2022. In March 2023, J.D. was removed from his foster home and returned to placement with his family, where he remained housed in a hotel for eight months.

15. During J.D.'s confinement, he was evaluated and diagnosed with reactive attachment disorder ("RAD") and post-traumatic stress disorder "PTSD."

16. J.D. received therapy through a diversion program throughout the 2022-2023 school year.

17. J.D. successfully completed the diversion program in October 2023.

18. J.D. attended Intensive Outpatient Treatment ("IOT") between March and April 2024.

19. During his IOT, J.D. received the additional diagnoses of Trauma Disorder, Paraphilic Disorder, and oppositional defiant disorder ("ODD").

20. Since April 2024, J.D. has continued to receive individual and family therapy.

*Enrollment in Adams 12 and Academics*

21. From adoption through the 2023-2024 school year, J.D. enrolled school in Defendant Adams 12 Five Star Schools ("Defendant" or the "District"). J.D. attended Hulstrom K-8 until May 2024, when he completed 8th grade.

22. J.D. and his parents reside just outside of the Defendant's jurisdiction. However, J.D. "choiced" into the District following adoption. *See* CRS § 22-36-101 ("requiring school districts to accept "nonresident pupils from other school districts within the state who apply pursuant to the procedures established pursuant to subsection (2) of this section").

23. Because of his disabilities, J.D.'s parents requested a special education evaluation in July and September 2023, which the District denied in October 2023. J.D.'s parents requested an additional evaluation in May 2024.

24. The May 2024 evaluation revealed that J.D. is of average intelligence and performs well academically but is strongly affected by his social/emotional disabilities while at home.

25. The Wechsler Intelligence Scale for Children-Fifth Edition ("WISC-V") is a measure of intelligence, thinking, and reasoning skills that yields a full-scale IQ ("FSIQ") and general intellectual ability ("GIA") score.

26. J.D.'s WISC-V results revealed that he possesses an average FSIQ and GIA. However, individually, he performed highly above average on the Visual Spatial and Fluid Reasoning indices of the text.

27. J.D.'s Measure of Academic Progress ("MAP") results from 2023 and 2024 also show average intelligence and performance, with a high potential for growth.

28. In fall 2023, J.D. received a score of 239 on the MAP math exam, which placed him in the 67th percentile, or high average group. His growth between fall 2023 and spring 2024 also placed him in the 65th percentile for growth.

29. In spring 2024, J.D. received a score of 231 on the MAP reading exam, which placed him in the 71st percentile, also in the high average group. His reading growth also placed him in the 70th percentile, also indicating high growth.

30. J.D.'s 2023 Colorado Measure of Academic Success ("CMAS") results showed similar levels of growth. For example, in 2023, J.D. received a 733, a score in the 55th percentile, indicating that he required additional math support. Compared to his 71st percentile MAP score in 2024, J.D.'s math skills grew significantly between 2023 and 2024.

31. For grade level standards, J.D. met state standards in social studies, writing, and reading. J.D. approached grade-level standard in science.

32. All this data indicates that despite his disabilities, J.D. is an academically proficient child who performs well in school.

33. Despite his significant social/emotional disabilities, J.D. performs well at school and experiences most of his disability symptoms and complications at home.

34. As part of his special education evaluation, the District administered the Behavior Assessment System for Children-Third Edition ("BASC-3"), which collects qualitative data from J.D., his parents, and teachers.

35. J.D.'s teachers, Henry Hedberg and Zach Hill, flagged a few areas including making friends and joining groups as "at risk," indicating some struggles with social withdrawal, but otherwise rated most of J.D.'s social and emotional skills and capabilities within the typical range.

36. Similarly, J.D.'s self-report scores mostly fell within the average range.

37. J.D.'s self-report scores indicated average attitudes about beliefs and behaviors, including self-esteem and confidence.

38. J.D.'s self-reports noted more significant issues at home and with his parents.

39. For their part, J.D.'s parents rated many of J.D.'s scores within the "clinically significant" or at-risk ranges. These scores indicate that J.D. displays disruptive, impulsive, and uncontrolled behaviors at home.

40. Comparatively, J.D.'s BASC-3 results indicate that the effects of his disabilities are more pronounced and significant at home rather than at school.

41. In-school observations indicated a similar trend. J.D. was observed on May 13th and 22nd, 2024. The observations revealed that J.D. follows social norms and socializes with friends and others naturally. He followed adult directions and did not exhibit any atypical social behaviors.

42. J.D.'s Emotional Disturbance Decision Tree ("EDDT") revealed a similar disparity between disability manifestations and symptoms at-home and at-school.

43. Kim Stomberg, one of J.D.'s teachers, rated him as "normal" within each assessed domain. Mr. Hedburg rated J.D. at normal or "mild at risk" on four of the five domains.

44. Comparatively, his parents rated J.D. at "very high clinical" on every domain, and J.D. rated himself as "high clinical" and "very high clinical" on two of the domains, with "moderate clinical" and "normal" scores in the remaining categories.

45. According to the evaluation itself, J.D.'s disabilities did not manifest any educational impacts, leading the District to deny J.D. special education services.

46. The results indicated that J.D. experiences more significant challenges at home than at school, and "[a]t school, [he] is able to maintain typical behavior and emotional reactions."

47. The discrepancy between J.D.'s parents' and teachers' perspectives establish that while J.D. continues to experience manifestations and complications from his disabilities, he can regulate his behaviors and emotions throughout the school day.

*Denial of Access and Accommodations*

48. As a Hulstrom student, after 8th grade, J.D. needed to transition to high school. As a student in the District, he naturally intended to continue his education in Adams 12.

49. J.D. and his parents began the high school transition process in the early 2024 and requested a placement at Horizon High School ("Horizon").

50. Horizon accepted J.D. and he registered and attended an open house. J.D. received a formal enrollment notice on February 27, 2024.

51. Because J.D. was on a safety plan at Hulstrom, J.D.'s parents worked with Horizon directly to ensure a smooth transition to high school. Hulstrom confirmed with J.D.'s parents that it would arrange a transition meeting with Horizon; however, no meeting occurred.

52. For its part, Horizon affirmed that J.D. could attend with his plan and noted that other already enrolled students also had safety plans.

53. However, on May 8, 2024, Megan Cain, Chief Academic Officer for the District, contacted J.D.'s parents to inform them that the Defendant denied J.D.'s enrollment throughout the District.

54. Ms. Cain cited the following as reasons for the Defendant's decision:

    a. An alleged violation of "no contact" rules during his IOT;

    b. An alleged incident where J.D. created an email address;

    c. An alleged inability to ensure student safety at Horizon; and,

    d. The Defendant's decision to assign J.D. a full-time paraprofessional to supervise him at school;

55. Each of these factors, if true, pose vanishingly small threats to the Defendant's ability to protect and manage students including J.D. More importantly, the reasons are illusory excuses for excluding J.D. based on his disabilities.

56. First, the alleged no contact violation never occurred. While the Defendant's knowledge of J.D.'s actions during his time in IOT raises further concerns about his right to privacy, nevertheless, J.D. never actually violated a no contact provision.

57. Rather, J.D. learned some contact information of another participant in the program; however, the contact information was taken and destroyed. No improper contact ever occurred.

58. Second, the email incident cited by Ms. Cain alleged only that J.D. created an email account in violation of the technology use provisions of his safety plan. The allegation does not allege any kind of harm or threat of harm to any students or personnel.

59. Whether true or not, the creation of an email account does not pose a threat to any other student or staff, nor does it prevent the Defendant from conducting its programs.

60. Third, the Defendant's threat allegation, implicitly asserted that J.D. posed a threat to other students. The only basis for accusing J.D. of posing a threat to other students is his status as disabled. Importantly, J.D. has never constituted a threat to another student. Moreover, the Defendant's allegation misrepresents that J.D.'s 1:1 paraprofessional assignment was based on safety concerns. This is fundamentally untrue.

61. J.D. never received a paraprofessional to ensure the safety of other students. J.D. received a paraprofessional to monitor his technology usage. The Defendant's decision to increase J.D.'s paraprofessional assignment to full time was made in response to his creation of an email account. Again, J.D. never threatened or posed a threat to any other students at Horizon.

62. Fourth, as discussed, the Defendant *chose* to increase J.D.'s paraprofessional support to monitor his technology usage. The Defendant's decision to increase the amount of time

spent with a paraprofessional is not a basis for denying J.D. an education, especially after denying him special education services.

63. The Defendant is speaking out of both sides. It cannot credibly claim that J.D. is insufficiently disabled to receive special education services while also asserting that J.D.'s disabilities are sufficient to deny him an education.

64. The Defendant is legally required to educate all public schools within its jurisdiction and all Colorado students who "choice" into its District. CRS § 22-36-101. That requirement includes J.D., whether the Defendant likes it or not.

65. Simply, whether J.D. requires special education services is immaterial to his right to attend school. 42 U.S.C § 12132; CRS § 22-36-101.

66. Additionally, pursuant to state law, a school district may only deny an out-of-district student their school of choice for five reasons, of which three are relevant here:[1]

   a. When "[t]here is a lack of space or teaching staff within a particular program or school requested . . ."
   b. Where "[t]he school requested does not offer appropriate programs or is not structured or equipped with the necessary facilities to meet special needs of the pupil or does not offer a particular program requested."
   c. Where "[t]he pupil does not meet the established eligibility criteria for participation in a particular program . . ."
   C.R.S § 22-36-101(3)

67. None of the Defendant's excuses for excluding J.D. fall within the grounds permitted by state law.

68. First, the Defendant failed to allege any lack of space or staff.

69. Second, the Defendant also failed to allege any lack of appropriate programs, structure, or equipment necessary for J.D. to attend.

---

[1] The two remaining grounds concern desegregation plans and expelled students, neither of which concern J.D.

70. Third, the Defendant also failed to allege any failed eligibility criteria for denying J.D. admission.

71. Furthermore, in each case, the Defendant's February 2024 decision to admit J.D. to Horizon vitiates any claim that it *now* lacks space or programming or that J.D. lacks admissions criteria. If any of these claims had merit, the Defendant would not have admitted J.D. in February 2024. Because it did admit him, the Defendant cannot now retract that admission based on illusory allegations that have no connection to the law.

72. Accordingly, each of the legally permissible grounds available to the District are not applicable to J.D. because the District *already* admitted him in February 2024. Moreover, no new facts have emerged that constitute a fundamental or even significant change to his circumstances, sufficient for the District to alter course.

73. Instead, and more fundamentally, the Defendant's action smack of clear animus to J.D.'s disabilities.

74. Parsing the Defendant's excuses for disqualifying J.D. from enrollment reveals that the Defendant, considers J.D. a threat to the safety and stability of its schools.

75. However, J.D.'s disabilities not only do not possess a threat, but also, any manifestations of his disabilities manifest *in the home*, not at school.

76. Accordingly, the Defendant posits that because J.D. possesses distasteful disabilities, he must also pose a danger to other students.

77. The Defendant's safety concerns, whether valid or invalid, are not a basis to deny J.D. entry to his school of choice. CRS § 22-36-101.

78. Colorado's school choice law does not include an exception based on the operation of a safety plan. *Id.*, at (3). Rather, the only applicable exception to J.D.'s circumstances is the lack of "appropriate program[ming]." *Id.*, at (3)(b).

79. However, the Supremacy Clause does not allow for the operation of state law to preclude federal statute. USCS Const. Art. VI, Cl 2; *see* 42 U.S.C § 12132.

80. Reliance upon Colorado's school choice law to exclude a child from a public school clearly violates the ADA under these circumstances. 42 U.S.C § 12132.

81. Federal law requires the public education of *all* children. 42 U.S.C § 12132. As an ADA recipient, the State of Colorado is bound to the ADA. Accordingly, Colorado is not free to legislate a loophole to the ADA's requirements.

82. Pursuant to the ADA, public schools must include disabled children. 42 U.S.C.S. § 12132. Furthermore, the ADA requires public schools to "make reasonable modifications . . . [when] necessary to avoid discrimination . . ." 28 C.F.R. § 35.130(b)(7)(i). Such modifications may only be rejected where they "would fundamentally alter the nature of the service, program, or activity." *Ibid.*

83. The Defendant violated the ADA by excluding J.D. from its public schools solely on the basis of his disability.

84. Had J.D. been a similarly situated nondisabled student, the Defendant would have no legal authority under Colorado's school choice law to deny him entry.

85. The Defendant made no effort to modify its programs to accommodate J.D., nor did it make any effort to assert that modifications, such as enforcing its safety plan, would constitute a fundamental alteration to its programming.

86. The Defendant made no such effort, in part, because enforcing the safety plan to enable one student to attend school cannot constitute a fundamental alteration. Students across the Defendant's district, and across the State of Colorado, and United States, attend school with safety plans. Their operation and enforcement is not a fundamental alteration to the operations or programming of their schools.

87. By basing its decision to exclude J.D. on the operation of his safety plan, the Defendant willfully discriminated against J.D. as compared to other similarly situated, non-disabled students, with mental health disorders such as paraphilia.

88. Exclusion of a child from public school based on their disability status also plainly violates state law. CRS § 24-34-802.

89. By excluding J.D. based on safety concerns surrounding his disabilities, the Defendant unequivocally excluded J.D. based on his disability status.

## IV.   LEGAL CLAIMS

### COUNT I

**DEFENDANTS VIOLATED SECTION TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12131**

90. Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

91. Title II of the ADA and its regulations provide that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or actives of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (*see also* 28 C.F.R. Part 35).

92. Plaintiff's is disabled within the meaning of the ADA and his disabilities impair major life activities such as communicating, working, and thinking.

93. Defendant is a public entity subject to Title II of the ADA, 42 U.S.C. § 12132.

94. Defendant had knowledge of Plaintiff's disabilities.

95. Defendant's decision to exclude Plaintiff was intentional and based solely on his disability status.

96. Defendant's decision to deny Plaintiff admission excluded him from participation in and denied him the benefits of Defendants' services, programs, and activities, based on disability, and by subjecting him to discrimination in violation of 42 U.S.C. § 12132.

## COUNT II

### DEFENDANT VIOLATED SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794

97. Plaintiff incorporates, by reference, all previous paragraphs of the Complaint herein.

98. Pursuant to Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its regulation "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794

99. Defendant is a recipient of federal financial assistance and operate a public elementary or secondary education program or activity, as covered under 29 U.S.C. § 794.

100. The Plaintiff is a person with a disability within the meaning of 29 U.S.C. § 794.

101. The Defendant intentionally discriminated against the Plaintiff by failing to provide reasonable accommodations, in violation of 29 U.S.C. § 794 and its implementing regulations.

102. The Defendant intentionally discriminated against the Plaintiff by excluding him from participation in and denying him the benefits of Defendant's programs or activities

solely because of his disability in violation of 29 U.S.C. § 794 and its implementing regulations.

## COUNT III

**DEFENDANT VIOLATED THE COLORADO ANTI-DISCRIMINATION ACT, C.R.S. § 24-34-601**

103. Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

104. The CADA prohibits public entities, including "educational institution[s]" from discriminating based on disability. C.R.S. § 24-34-601(1-2).

105. The Defendant is a public educational institution, subject to state and federal law.

106. Defendant intentionally discriminated against the Plaintiff by failing to provide reasonable accommodations, in violation of C.R.S. § 24-34-601.

107. The Defendant intentionally discriminated against the Plaintiff by excluding him from participation in and denying him the benefits of Defendant's programs or activities solely because of his disability in violation of C.R.S. § 24-34-601.

## COUNT IV

**DEFENDANT'S USE OF COLORADO'S SCHOOL CHOICE LAW OFFENDS FEDERAL LAW**

108. Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

109. Both the ADA and Section 504 prohibit places of public accommodations from discriminating against the disabled. 42 U.S.C. § 12132; 29 U.S.C. § 794.

110. The Defendant is a public accommodation subject to the ADA and Section 504.

111. By excluding the Plaintiff from its enrollment in public school, the Defendant discriminated against the Plaintiff in violation of the ADA and Section 504.

112. The Defendant's actions rely on its interpretation of Colorado's School Choice Law. C.R.S § 22-36-101.

113. The Defendant's interpretation of the School Choice Law conflicts with its obligations under federal law. *See* 42 U.S.C. § 12132; 29 U.S.C. § 794.

114. The Supremacy Clause forbids state law from abrogating federal law. USCS Const. Art. VI, Cl 2.

## COUNT V

## DEFENDANT'S USE OF COLORADO'S SCHOOL CHOICE LAW VIOLATES CADA

115. Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

116. The CADA prohibits places of public-school districts from discriminating against the disabled. C.R.S. § 24-34-601(1-2).

117. By excluding the Plaintiff from its enrollment in public school, the Defendant discriminated against the Plaintiff in violation of the CADA.

118. The Defendant's actions rely on its interpretation of Colorado's School Choice Law. C.R.S. § 24-34-601(1-2).

119. The Defendant's interpretation of the School Choice Law conflicts with its obligations under the CADA. C.R.S. § 24-34-601(1-2).

## COUNT VI

## DECLARE THE COLORADO SCHOOL CHOICE LAW DOES NOT PERMIT SCHOOL DISTRICTS TO EXCLUDE CHILDREN UNDER THESE CIRCUMSTANCES

120. Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

121. 28 U.S.C confers jurisdiction upon the federal courts to exercise supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367.

122. The state and federal claims brought herein are "so related . . . that they form part of the same case or controversy." *Ibid.*

123. 28 U.S.C. § 2201 confers jurisdiction upon the courts to "declare the rights and other legal relations of any interested party." 28 U.S.C.S. § 2201(a).

124. Rule 57 of the Federal Rules permit the courts to order a speedy hearing of a declaratory judgment action.

125. Rule 57 of the Colorado Rules confers jurisdiction upon the courts to "make uniform the law of those states which enact it, and to harmonize, as far as possible, with federal laws and regulations . . ." C.R.C.P 57(l).

126. Colorado's School Choice Law, C.R.S. § 22-36-101(2)(b) "only" permits school districts to "deny" a student "enroll[ment]" for five reasons:

> **(a)** There is a lack of space or teaching staff within a particular program or school requested, in which case, priority shall be given to resident students applying for admission to such program or school.
> **(b)** The school requested does not offer appropriate programs or is not structured or equipped with the necessary facilities to meet special needs of the pupil or does not offer a particular program requested.
> **(c)** The pupil does not meet the established eligibility criteria for participation in a particular program, including age requirements, course prerequisites, and required levels of performance.
> **(d)** A desegregation plan is in effect for the school district, and such denial is necessary in order to enable compliance with such desegregation plan.
> **(e)** The student has been expelled, or is in the process of being expelled, for the reasons specified in section 22-33-106 (1)(c.5) or (1)(d) or the student may be denied permission to enroll pursuant to section 22-33-106 (3)(a), (3)(b), (3)(c), (3)(e), or (3)(f).

127. Colorado's School Choice Law does not permit a school district to deny a student enrollment for safety concerns.

128. Colorado's School Choice Law does not permit a school district to deny a student enrollment based on the enforceability of a safety plan.

129. A school safety plan is not an "appropriate program. . . necessary . . . to meet the special needs of the pupil." *Ibid.*

130. Colorado's School Choice Law does not define "appropriate program[s]" but consistently uses the term to describe academic and extracurricular programming. *Ibid.* The term does not incorporate individualized student safety concerns, nor safety plans.

131. A safety plan is also not a "structure" nor facility as otherwise enumerated. *Ibid.* Neither term incorporates individualized student safety concerns, nor safety plans.

132. Colorado's School Choice Law does not permit the District to deny Plaintiff enrollment based on safety concerns and his safety plan, nor would it allow any district to exclude a child based on similar circumstances.

## V. PRAYER FOR RELIEF

WHEREFORE, the Plaintiff requests the following relief:

A. Find that the Defendant violated state and federal law;

B. Find the Plaintiff is the prevailing party;

C. Award the Plaintiff declaratory relief that Colorado's School Choice Law does not permit school districts to discriminate against disabled students in violation of the ADA and Section 504;

D. Award the Plaintiff declaratory relief that Colorado's School Choice Law does not permit school districts to discriminate against disabled students in violation of the CADA;

E. Award the Plaintiff declaratory relief that Colorado's School Choice Law does not allow school districts to reject children's choice applications under the circumstances of this case.

    F.    Award the Plaintiff equitable relief;

    G.    Award the Plaintiff compensatory damages;

    H.    Award the Plaintiff his reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and/or other applicable statutes; and

    I.    Any other relief deemed necessary or appropriate.


*/s/ Conor O'Donnell*
Conor O'Donnell
Igor Raykin
Kishinevsky & Raykin, Attorneys at Law
2851 S. Parker Rd., Suite 150
Aurora, CO 80014
Phone: 720-748-8888
igor@coloradolawteam.com
conor@coloradolawteam.com
**Attorneys for Plaintiff**